## ESTATE OF JOHN ESHELMAN, DECEASED.

**APPEAL BY ANNIE E. KEIVER FROM THE ORPHANS' COURT OF CUMBERLAND COUNTY.**

Argued April 27, 1891—Decided May 27, 1891.
[To be reported.]

1. A testator recited in his will that he was indebted to his sisters in certain sums which he directed his executor to pay. On distribution, his widow objected to the allowance of said sums, averring that they were

Statement of Facts.

not bona-fide debts, and that the will was in fraud of her rights. The competency of the sisters to testify that the indebtedness was bona fide, doubted, but not decided.

2. When declarations of a decedent are offered, not for the purpose of creating a debt, or of taking the case out of the statute of limitations, but to rebut a presumption of payment arising from receipts and releases,* their admissibility does not depend upon their being made directly to the creditor or his agent, but they may be proved by the testimony of any one who heard them.

3. The presumption of actual payment, arising from a receipt for purchase money in a deed, or from an acknowledgment of payment in a release of a charge on land, * is not a conclusive presumption, but may be rebutted by parol evidence. In the present case, there was sufficient competent testimony submitted to rebut such presumption.

4. A widow, a legatee under the will of her husband, will not be granted an issue to determine the bona fides of an alleged indebtedness of the testator, which his will expressly admits to be owing and directs to be paid, when she has not elected to take against the will, and her right to do so has been extended by agreement until final settlement of the estate: Per STEWART, P. J.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 190 January Term 1891, Sup. Ct.; court below, number and term not shown.

John Eshelman died without issue on October 6, 1885, leaving a widow, Annie E. Eshelman, the appellant, and six sisters, whose names appear in the quotation from his will below. The will of the decedent was dated June 20, 1885, and was admitted to probate on October 12, 1885. By said will, the testator devised a certain lot to David G. Beidleman; bequeathed certain chattels to two of his sisters respectively; directed the conversion into money of all the residue of his property, real and personal, and bequeathed to his wife out of the proceeds thereof the sum of twenty-five hundred dollars. He then provided, inter alia, as follows:

"I owe my sister, Ann R. Eshelman, the sum of four thousand six hundred dollars. I owe my sister Mary Eichelberger two thousand dollars. I owe my sister, Fanny Lantz, two thousand dollars. I owe my sister Elizabeth May, two thou-

---

* See foot-note on page 30, post.

sand dollars.  I owe Catharine Wolf two thousand dollars.  I owe Susan R. Eshelman two thousand dollars.  My executor hereinafter named is directed to pay the several sums mentioned to my sisters, within two years after my death; . . . . ''

David G. Beidleman was named in the will as the executor thereof, and letters testamentary were duly issued to him.  On August 16, 1887, the first and final account of the executor, exhibiting a balance of $5,458.01 in his hands for distribution, was confirmed by the Orphans' Court, and on September 20th, *Mr. A. B. Sharpe* was appointed auditor to distribute said balance.

On February 2, 1890, while the proceeding to distribute was pending before the auditor, the widow entered an appeal to the Orphans' Court from the decree of the register admitting the decedent's will to probate, and on the same day she presented to the auditor a demand for an issue, to determine whether or not certain judgment bonds, signed by the testator in favor of his six sisters, respectively, for the sum of two thousand dollars each, bearing date June 19, 1885, payable April 1, 1888, presented to the auditor for allowance as debts due from the estate of the testator, were executed on the same day with the will, were intended to be and were actually delivered to the several obligees after the death of the testator, and were executed and directed so to be delivered for the purpose of injuriously affecting the interest of the widow in his estate, the testator, as was averred, declaring at the time of executing them that he was not indebted to said obligees and that they were made for the purpose aforesaid.  The demand for an issue was thereupon certified to the court by the auditor, with the testimony taken before him.

After argument, the court, STEWART, P. J., 39th district specially presiding, on May 1, 1889, filed an opinion in part as follows :

In support of the motion for an issue, counsel have submitted the evidence taken before the auditor appointed to make distribution of the funds in the hands of the executor.  In the view we take of this case, it is not necessary to consider this evidence at length, nor to pass upon its sufficiency for the purpose it was submitted, at this time.

Opinion of Court below.

The application for the issue is made on behalf of the widow, who alleges that the several bonds specifically set out in her motion and which were executed by the testator, were not delivered to the obligees in the testator's lifetime; that they were without any consideration to support them, and that they were executed by the testator with directions for their delivery after his death, for the purpose of injuriously affecting the interests of the widow in his estate. The testator, by his will, gives to his widow the sum of two thousand five hundred dollars, and by his will he recognizes the bonds referred to as his proper debts, and directs their payment. We have not been furnished with a copy of the will, but these facts appear from the evidence submitted, as well, also, the further fact, which we regard as entirely controlling, viz., that the widow has not, as yet, made her election with reference to testator's will.

It may be that the testator had no other purpose in executing the bonds and in directing their payment in his will, than to reduce the share of his estate which otherwise his widow would be entitled to receive. But, however this was, the same will which directs the payment of these bonds gives to the widow a legacy of two thousand five hundred dollars. If she accepts this provision made for her, she cannot be heard to assert a claim repugnant to the terms of the very will from which she derives a benefit, and until she makes her election, how are we to know what her purpose in this regard is? She cannot accept this legacy of two thousand five hundred dollars, and then contest the validity of the will with respect to the bonds. It is only by putting herself in opposition to the entire will, so far as her own interests are concerned, that she can have any standing to contest any part of it. If she takes under the will, she takes whatever benefits it confers, along with all the disadvantages which may result. If, on the other hand, she takes against the will, in such case, she is not concluded by any of its terms. But, until she does the latter, she is not in position to ask for an issue respecting the validity of any of the provisions of the will.

It might be that, under ordinary circumstances, the court would be warranted in accepting this request for an issue as an election to take against the will; but the evidence submitted shows an agreement between the parties that the exer-

cise of her privilege of election is to be continued or postponed until a final settlement, and that her acts meanwhile are not to prejudice her rights in this regard. This agreement leaves the matter open and undetermined. Under existing circumstances, the issue ought not to be awarded. But the rule must be discharged without prejudice to the right of the petitioner to renew the application, upon her filing her election to take under the intestate laws of the commonwealth.

Rule discharged.

—From the order discharging said rule, Annie E. Eshelman on August 27, 1889, took an appeal to the Supreme Court.

The audit was then proceeded with, against the objection of Mrs. Eshelman; and, on February 10, 1890, the auditor filed his report, embodying the material testimony relating to the controversy between the widow and the sisters of the testator as to the allowance of the bonds held by the latter, in the distribution. The testimony was in substance to the following effect:

H. N. Bowman, the scrivener of the will, testified that he had written a prior will for the testator, by which no legacies were given to the latter's sisters; that, when the witness was writing the last will, he inquired of the testator whether the latter owed the two thousand dollars which he was giving to each of his sisters, to which the testator replied that "he did not, but that he did not want the woman, as he called Mrs. Eshelman, to get more than twenty-five hundred dollars;" that the will and the bonds were written at one sitting and executed at the same time; that their execution was attested by the witness and by Beidleman, the executor, and that Beidleman was instructed by the testator to hold the bonds until after his death, and then deliver them to the sisters. Beidleman testified that his recollection of the conversation, in connection with the preparation and execution of the will and bonds, was substantially the same as that of Bowman; that the will and bonds were both handed to the witness on the day of their execution, June 20, 1885, with instructions to hand over the bonds to the sisters after the testator's funeral, and in pursuance of these instructions the witness did hand them over on the day the testator was buried, without having taken advice of counsel on the subject.

Statement of Facts.

For the obligees in the bonds, several witnesses testified to conversations between themselves and the testator at different times between 1861 and 1885, in which the testator made declarations to the effect that he was indebted to his sisters for their interests in his father's estate, he having taken the farm and their money having been left in it, and that they had given him releases without receiving any papers in return, and held no notes for their money. Parts of the testimony of these witnesses are quoted in the opinion of the Supreme Court, infra. Four of the testator's sisters, and John Lantz, the husband of one of them, testified under objection as to their competency. Their testimony tended to prove that the six sisters conveyed to the testator their interests in the farm left by their father, under an arrangement that each of them should leave one thousand dollars of the consideration money in the farm; that the testator at different times talked with his sisters about the sums thus owing to them, saying that they would not lose their money, but would get it when the farm was sold; and that, but a short time before his death, he told at least two of them that he had fixed things so that they would all get their money, having made notes for it, and that he stated to one of the sisters that the notes were in the possession of Mr. Beidleman or Mr. Bowman.

The deed, by which the testator's sisters conveyed their interests in the farm to the testator, was put in evidence by the widow. It bore date March 20, 1861, and recited an agreement between the widow and heirs of Jacob Eshelman that John, one of them, should take the farm at twelve thousand dollars, "deducting from the said valuation money the sum of $705.61, charged upon the said land in favor of the widow and heirs of John Moltz, and the further sum of $2,884.72⅔ also charged on the same tract in favor of the widow and heirs of Jacob Moltz;" one third of the balance of the said valuation money to be charged on the said land, the interest thereon to be paid Elizabeth Eshelman, the widow, during her life, and at her death the principal sum of the said one third part to the said children of the said Jacob Eshelman; John Eshelman to pay to his sisters their equal shares of the other two thirds of the valuation money. The deed then stated the consideration of the conveyance to be the agreement so recited and, also,

Auditor's Report.

"the sum of $799.58, paid by the said John Eshelman to each of his said sisters, the receipt whereof is hereby acknowledged," and conveyed the land subject to the two charges of $705.61 and $2,884.72⅔, mentioned in the agreement recited, and to a further charge of $2,803.20, the interest whereon was to be paid to Mrs. Elizabeth Eshelman during her life, and at her death the principal to be paid to the children of Jacob Eshelman, including said John, in equal proportions.

The widow also put in evidence a release* from the daughters of Jacob Eshelman to John Eshelman dated June 16, 1866, acknowledging the payment of $406.46 to each of said daughters, in full satisfaction of all moneys payable to them out of the estate of Jacob Eshelman, deceased, after the death of their mother, Elizabeth Eshelman, deceased; and the account of John Eshelman as administrator of Jacob Eshelman, deceased, which showed a balance for distribution of $5,216.23, and claimed credit for payments on distribution aggregating $3,208, as follows: to the widow $808, and to each of the daughters $400.

Upon the testimony before him, the auditor found that the several bonds held by the sisters of the testator, dated June 19, 1885, for two thousand dollars each, represented legitimate debts entitled to come in on the fund for distribution,[1] and reported further the following conclusions of law:

[That the appeal taken by the widow of testator (from the decree of the register of the twelfth of October, 1885, admitting to probate the will of testator), which is dated the second of February, 1887, is too late to be effective, as more than three years had intervened before she took it, and it therefore is no supersedeas.] [11]

[That her appeal to the Supreme Court from the decree of Judge Stewart, filed May 1, 1889, declining to grant an issue until she elected to take under or against the will of testator, is no supersedeas, nor is it a reason why the auditor should

---

* This instrument was called a "release," in the auditor's report, but whether it was such technically did not appear, though the statement of its terms as given in the report and minutes of the auditor, would indicate that it was nothing more than a receipt acknowledging satisfaction, and did not contain any release or discharge of the debt.

delay making this distribution, as no right to an appeal exists, the power to grant or withhold an issue being exclusively with the court below.] [8]

[That he had authority in the premises to do all he has done, although there was no direction to him to proceed by the court in their opinion filed on May 1, 1889. This was not needed.] [9] The record of the proceedings before the auditor up to February 2, 1889, with the opinion of the court declining the demand of the widow for an issue, and her appeal from the decree of the register, were all handed to the auditor by counsel, requesting him to fix a day of meeting; and he, on May 14, 1889, had the written consent of all the counsel in the case, those concerned for the executor and the creditors, as well as the counsel for the widow, to meet on the eighteenth of that month at his office; and they did attend on that day and at all the subsequent meetings up to the twenty-fourth of January, 1890, when the audit closed.

[He overrules the objection to the competency of Annie R. Eshelman, Mrs. Fanny Lantz, their two sisters, and John Lantz, taken by the counsel for the widow, and holds that the exceptions can relate only to their credibility; as he does, also, the exceptions of the counsel on both sides, taken to the testimony embodied and considered in his report.] [3]

—In accordance with his conclusions, so reported, the auditor, after surcharging the accountant with $7,338.25, increasing the net balance for distribution, after payment of costs, to $12,556.87, distributed that sum pro rata to the six bonds in controversy and to a number of notes and accounts allowed as claims against the decedent's estate, the dividend awarded on each claim being a fraction over sixty-five per cent.

To the report of the auditor the widow filed exceptions alleging that the auditor erred in his findings and conclusions. [1] [3] [8] [9] [11]

Said exceptions having been argued, the court, STEWART, P. J., specially presiding, on November 14, 1890, filed an opinion and decree as follows:

We have delayed making a disposition of this case, in the expectation that an election by the widow of John Eshelman would be made, either voluntarily or by citation under the act

of assembly, in view of the opinion filed when the application for an issue was before us. Neither has been done, and the matter should be concluded without further delay.

The findings by the auditor are fully warranted by the evidence in the case, and his conclusions of law are correct. The exceptions, therefore, are overruled, the report is confirmed, and the accountants directed to pay over the balance in their hands, in accordance with the schedule submitted by the auditor.

—Thereupon the widow, Annie E. Eshelman, now Annie E. Keiver, took this appeal, specifying inter alia that the court erred:

1, 3. In not sustaining appellant's exceptions.[1] [3]

8, 9. In not sustaining appellant's exceptions.[8] [9]

11. In not sustaining appellant's exception.[11]

*Mr. John Hays* (with him *Mr. R. M. Henderson*), for the appellant:

1. That the bonds, and the clause in the will reciting the alleged indebtedness to the testator's sisters, were intended by him to defraud his wife out of a larger share of his estate than two thousand five hundred dollars, is established by the testimony of Bowman and Beidelman, and the auditor should have so found: Evans v. Dravo, 24 Pa. 62; Killinger v. Reidenhauer, 6 S. & R. 531; Barr v. Boyles, 96 Pa. 31; Young v. Edwards, 72 Pa. 257; Loucheim Bros. v. Henszey, 77 Pa. 305; Craver v. Miller, 65 Pa. 457. By claiming upon the bonds, the appellees affirm the purpose of the testator in making them; they cannot "repudiate the fraud and yet hold on to its fruits:" Jones v. Building Ass'n, 94 Pa. 215; Musser v. Hyde, 2 W. & S. 314; Hunt v. Moore, 2 Pa. 105; Mundorff v. Wickersham, 63 Pa. 87; Lycoming Ins. Co. v. Woodworth, 83 Pa. 223; Keough v. Leslie, 92 Pa. 424; Coble v. Nonemaker, 78 Pa. 501; Ross's App., 127 Pa. 4.

2. The testator's sisters and the husband of one of them were not competent witnesses. If the wife was incompetent, the husband was also: Bitner v. Boone, 128 Pa. 567. The claims of all the sisters grow out of a transaction to which the testator was a party. He is dead, and his estate is a party to the record; the sisters all claiming adversely to him and his

Arguments.

estate. By his death, the equality which the statutes aim at was destroyed, and the claimants were rendered imcompetent: Van Horne v. Clark, 126 Pa. 411; Mell v. Barner, 135 Pa. 151; Bell v. Farmers' Bank, 131 Pa. 318; Dick v. Williams, 130 Pa. 41; Parry v. Parry, 130 Pa. 94; DeCoursey v. Johnston, 134 Pa. 328; Duffield v. Hue, 129 Pa. 94. They were incompetent as surviving parties to the transaction, even if they had not been interested in the controversy: Palmer v. Farrell, 129 Pa. 162.

3. As acknowledgments of indebtedness, the statements of the testator, testified to by witnesses other than parties to the proceeding, were bad, because made to persons not acting as agents or representatives of the claimants: Gregory v. Commonwealth, 121 Pa. 611; Porter v. Nelson, 121 Pa. 628; Runner's App., 121 Pa. 649; Bentley's App., 99 Pa. 500; Spangler v. Spangler, 122 Pa. 358. Moreover, none of the testimony is definite enough to comply with the requirements of the rule as to the sufficiency of an acknowledgment of indebtedness, laid down in Montgomery v. Cunningham, 104 Pa. 349; Lawson v. McCartney, 104 Pa. 356; Landis v. Roth, 109 Pa. 621; Shaeffer v. Hoffman, 113 Pa. 1. And the auditor and court erred in holding that the appeal from the probate of the will was in effectual as a supersedeas, because not taken in time. By § 7, act of April 22, 1856, P. L. 533, the time for taking an appeal in the case of wills devising real estate, was extended to five years. As this will directs the sale of real estate, that act applies and the appeal was in time: Folmar's App., 68 Pa. 482. It is still pending in the court below.

*Mr. M. C. Herman* (with him *Mr. W. J. Shearer*), for the appellees:

1. The real question in this case is one of distribution, not an inquiry devisavit vel non. Nor is the statute of limitations involved, for it was not pleaded, and it is difficult to see how it could have been. The debts directed by the will to be paid to the testator's sisters were fixed by the will itself, and needed no proof to support them. And the appellant should not have been heard in opposition to them, because she was claiming under the will, and was therefore not in a position to contest any of its provisions. If she was not satisfied with the will, she

Opinion of the Court.

could have elected to take under the intestate laws ; but, as it is, she can raise no question touching the validity of any of its provisions : Cunningham's Est., 137 Pa. 621.

2. But, why are not the sisters of the testator competent witnesses in such a contention as this ? They were not called to testify against his interest as manifested in his will, nor to establish a hostile claim against his estate. The real purpose of their testimony was to sustain his will, and overcome the allegation of fraud set up by the widow. The contest was with the widow, and with her only, and it related to the disposition which the testator had made of his estate. It was " between parties respectively claiming by devolution on the death of the owner," and therefore, under § 5, act of May 23, 1887, P. L. 159, all parties were " fully competent witnesses."

3. The land which the will directs to be sold would, as to the widow, be personalty if she take under the will, and realty if she refuse so to take: Cunningham's Est., 137 Pa. 621. Then, as she cannot have an appeal from the probate of the will without taking under it, the proceeds of the sale of the land are personalty as to her and all others, and § 7, act of April 22, 1856, P. L. 533, relied on by the appellant, would not apply. Her appeal from the probate not having been taken until more than three years thereafter, was too late: § 31, act of March 15, 1832, P. L. 144. Nor was her appeal from the decree refusing an issue authorized by any act of assembly: Baker's App., 59 Pa. 313 ; Thompson's App., 103 Pa. 603.

OPINION, MR. JUSTICE GREEN :

If the bonds given by the decedent to his sisters were founded upon an actual, bona-fide indebtedness, previously due by him to them, the estate of the decedent was insufficient for the payment of his debts, and all other questions raised upon the record become unimportant. The auditor has found in an elaborate and exhaustive opinion that the bonds are all legitimate debts of the testator, and entitled to come in on the fund for distribution. In this finding the learned court below has concurred, and has confirmed the auditor's report. It is true that the auditor admitted the evidence of the holders of the bonds, and was of opinion that it was competent testimony. We have much doubt as to the correctness of that ruling, but

as, in our opinion, the other and perfectly legitimate testimony fully supports and sustains the finding of the auditor, without the testimony of the obligees, it is not necessary for us to decide upon its admissibility, and our decision will be based upon a consideration of the other evidence only.

The transaction in which the indebtedness of the decedent to his sisters arose, was the conveyance of the farm owned by the father of the decedent and his sisters, and which descended to them all equally at their father's death. In 1861, the mother and sisters of the decedent by a deed dated March 20, 1861, formally conveyed to him the fee-simple title of all of them to this farm containing one hundred and thirteen acres or thereabouts. This deed was given in evidence by the appellant, and it recited an agreement between the widow and heirs of Jacob Eshelman, deceased, that John Eshelman, one of them, should take the farm at twelve thousand dollars, deducting therefrom two sums of $705.61 and $2,884.79⅔, respectively, charged on the land in favor of the widows of John Moltz and Jacob Moltz. One third of the balance of said valuation money was to be charged on the land for the use of the widow of Jacob Eshelman, during her life, and the principal to be paid at her death. The deed further recited that, in consideration of the payment of $799.58 to each of his sisters, and of the further sum of $2,803.20 at the death of their mother, the land was conveyed to John Eshelman. The deed contained the usual acknowledgment of the receipt of $799.58 paid to each of the sisters, and a release of all claims by the widow and sisters to the land. A release was also given in evidence dated June 16, 1866, after the death of the widow, of all claims to the sum of $400.46, being the share of each in the dower charge of the widow, who had then died. There was no proof of the actual payment of any money at the time the deed and release were given, and outside the testimony of the interested witnesses, which is rejected from the present consideration, there is no proof of the actual payment of any of the money due the sisters at any time. There is no question of the statute of limitations, or the presumption of payment, arising in the cause, because the decedent, in the most solemn and absolute manner possible, not only admitted and acknowledged his indebtedness to his sisters, but he expressly declared in his will the fact of

Opinion of the Court.

his indebtedness to each of them, stated the amount due to each, and positively directed his executor to pay the several amounts mentioned to each of them within two years after his death; and, in addition to this, he formally executed bonds to each of his sisters for the amounts due to them, respectively, payable on April 1, 1888, with two per cent annual interest, and directed his executor to deliver the bonds after his death.

The presumption of actual payment arising from the receipt contained in the deed, and from the release, is not a conclusive presumption, and may be rebutted by parol proof: Byers v. Mullen, 9 W. 266; Watson v. Blaine, 12 S. & R. 131; Hamsher v. Kline, 57 Pa. 397; Horton's App., 38 Pa. 294; Megargel v. Megargel, 105 Pa. 475. In the last case, a mortgagee had given to the mortgagor a receipt for five hundred dollars "in full satisfaction of the mortgage." We said, STERRETT, J.: "That was, of course, evidence of payment, but it was not conclusive of the fact. It was susceptible of explanation or of direct contradiction: Foster v. Beals, 21 N. Y. 247, 249; and, in point of fact, it was clearly and satisfactorily shown by the testimony of several competent witnesses that no part of the mortgage debt had ever been paid. Admissions of the mortgagor to that effect, made at different times after the date of the receipt, down almost to the time of his death, were clearly proven. The receipt which was the sole evidence of payment was thus successfully rebutted, and hence the referee was fully justified in finding the fact of non-payment, as above stated."

In the present case, there was an abundance of this kind of testimony from disinterested and perfectly credible witnesses. John Wolf said: "John Eshelman came to me the same year his father died. . . . . He said he was going to move back on the big farm, his father's farm. I said, 'I guess not.' Then he said, 'I have easy terms to buy it.' He said the agreement between him and his sisters was that they were to leave their shares in the farm. He told me they were getting equal shares; that he was to pay them what he got. That was all at that time. . . . . He told me once or twice while I lived on the little farm, when we settled, that he was getting in his money to pay off his sisters' interest; and he told me once or twice afterwards, when he got money from me, that he wanted it for

that purpose. This last conversation was four or five years after I had gone off the little farm." Jacob C. Wolf, a brother of John Eshelman's first wife, said: "Several times I had conversation with John Eshelman about owing his sisters, in 1881 and 1882 and thereabouts. He had my money, borrowed money from me; and at first I was not particular about a judgment note or anything of that kind, and after it got up a little way I told him I would like to have a judgment note. He said he would not give a judgment note to any person. He said he had money from other people, and he said he had his sisters' money, and they had no notes, and he said, if his word was no good, paper was no good. The last time he spoke to me about this was in 1883. . . . . He said he owed his sisters, and had their money without notes." Mrs. Catharine Bixler said: "I had a conversation with John and his wife. She said when she wanted to have anything fixed up in the house he said, wait until he has the sisters paid out, then he will live, too, like others. . . . The conversation was about ten years ago," (1878.) Jacob Stouffer said: "In March, 1883, John Eshelman and I were going to the bank at Harrisburg. I indorsed for John. Coming home he got to telling me in regard to his confidence in regard with his sisters. He also told me that when he settled up his pappy's estate that his sisters gave a release without any papers, and he told me that he wanted to use a part of this money for some of the sisters . . . . . He told me he would sell the large farm, and pay off his sisters." As John Eshelman died in October, 1885, this conversation occurred about two years before his death. David Eichelberger said: "When we butchered at Lantz's, I talked to him about fixing up his farm. I was there, Mr. Lantz, and John Eshelman. He (John) came there during the day. I asked why he did not fix up his buildings; that they would sell better. He said he owed his sisters too much money; he couldn't fix it."

It must be remembered that these declarations were not offered for the purpose of creating a debt, or for the purpose of taking the case out of the statute of limitations. They were offered to rebut the presumption of payment arising from the receipt in the deed, and from the release; and hence their admissibility did not depend upon their being made directly to the creditor or to his authorized agent. They could be proved by the testimony of any one who heard them.

Opinion of the Court.

We are of opinion that the auditor was fully justified in finding the fact that John Eshelman was indebted to his sisters upon the original conveyance of the farm ; that he had never discharged that indebtedness, and that there was therefore good and valuable consideration for the bonds in question. It was very evident that he was in the habit of borrowing money, and had use for it constantly. He owed a number of notes for quite considerable amounts at the time of his death, and the presumption of payment of his debts to his sisters is thereby much weakened. Against the manifest weight of the testimony on this subject, his declaration to the scrivener, that he did not owe his sisters, is of but little consequence. He might not have desired to admit the fact of so much indebtedness to one who is not shown to have been upon any particular terms of intimacy with him. But, whatever his motive may have been, he could not talk his sisters out of their rights as creditors, in their absence, by such a declaration to a stranger.

It is impossible to go into a close calculation of the exact amount due when the bonds were given, because there are no precise data on the record from which it could be made ; but, as he had a large amount in his hands upon the settlement of his administration account to which his sisters were equally entitled with. himself, in addition to the valuation money of the land, and as the sisters, who could have told what they had received, were objected to by the appellant, and as the mere accumulations of interest would constitute a large sum, we cannot make any inference, against so solemn an instrument as a bond, that the whole amount was not owing. The auditor has found that the bonds were given for full consideration, and no error in that finding has been clearly shown. In view of the conclusions we have reached, the other questions raised upon the record are of no consequence, and require no discussion.

The decree of the court below is affirmed, and appeal dismissed at the cost of the appellant.